[Cite as *State v. Ayers*, 2020-Ohio-2943.]

## COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

| | | |
|---|---|---|
| STATE OF OHIO, | : | |
| Plaintiff-Appellee, | : | |
| | | No. 108741 |
| v. | : | |
| DEONTE L. AYERS, | : | |
| Defendant-Appellant. | : | |

### JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** May 14, 2020

Criminal Appeal from the Cuyahoga County Court of Common Pleas
Case No. CR-18-630601-A

### *Appearances:*

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney, and Michael Barth, Assistant Prosecuting Attorney, *for appellee.*

Jerome M. Emoff, *for appellant.*

RAYMOND C. HEADEN, J.:

{¶ 1} Defendant-appellant Deonte L. Ayers ("Ayers") appeals from his conviction for aggravated robbery. For the reasons that follow, we affirm.

**Procedural and Substantive History**

{¶ 2} On July 26, 2018, the Cuyahoga County Grand Jury indicted Ayers on one count of aggravated robbery in violation of R.C. 2911.01(A)(1) with one- and three-year firearm specifications, and one count of having weapons while under disability in violation of R.C. 2923.13(A)(3). Ayers pleaded not guilty to the charges.

{¶ 3} On October 19, 2018, Ayers filed a motion to suppress. The motion argued that the search of the residence, the seizure of the automobile, and his own arrest were done without warrants and, therefore, violated his constitutional rights. On April 25, 2019, the court held a hearing on the motion to suppress.

{¶ 4} The state called North Olmsted Police Officer Hasim Welch-Bey ("Officer Welch-Bey"), who testified that on July 4, 2018, he responded to a call of a robbery that had been committed with a firearm in the area of the Jamestown Apartments in North Olmsted, Ohio. Officer Welch-Bey met with the victim, Ahmir Hawthorne ("Hawthorne"), who lived in the Jamestown Apartments.

{¶ 5} Hawthorne told Officer Welch-Bey that he was robbed at gunpoint inside of a vehicle. Hawthorne described the suspect as a black male, approximately six-feet tall, with tattoos on both of his arms, wearing jeans and a black shirt. Hawthorne also told Officer Welch-Bey that he got into the suspect's tan four-door vehicle to sell the suspect drugs, and that is where the robbery occurred. Initially, Hawthorne did not explain why he got into the suspect's vehicle, but he ultimately admitted to Officer Welch-Bey that he was engaged in a drug transaction. According to Hawthorne, the suspect took $30 worth of marijuana, a Star Wars wallet

containing his driver's license and debit card, and a Nike backpack containing a Crown Royal bag containing between $700 and $1,000 in cash.

{¶ 6} Officer Welch-Bey obtained surveillance footage from a nearby apartment building showing a tan Nissan Altima pull into the parking lot. The video also showed a man exit the vehicle, open the hood, and then get back into the vehicle. Officer Welch-Bey conducted a partial license plate search based on the surveillance footage and ultimately identified an address to which the vehicle was registered, 10803 Manor Drive in Cleveland, Ohio. He then provided this information to Cleveland police, who went to the address on July 6, 2018, and located the vehicle parked on the street in front of the address. Police confirmed to Officer Welch-Bey that the vehicle had the same damage to the front bumper that he had observed on the surveillance video.

{¶ 7} Later that day, Officer Welch-Bey, another North Olmsted police officer, and a detective responded to the listed address. Officer Welch-Bey knocked on the front door of the residence and spoke with a man who identified himself as the husband of the vehicle's listed owner. Officer Welch-Bey told the man that a younger male had been driving the vehicle when it was used in a hit and run accident, and the man responded that would have been his daughter's boyfriend, Ayers.[1] The man informed Officer Welch-Bey that Ayers was upstairs and offered to

---

[1] Officer Welch-Bey explained that he told the man that the vehicle had been involved in a hit and run because he felt that the man was not being very forthcoming with information, although the vehicle had not been involved in such an accident.

get him.  Officer Welch-Bey asked if he and the other officers could accompany the man upstairs, and they were then invited inside.

{¶ 8}   Ayers and his girlfriend, Patrice Warren ("Warren"), were sleeping in an upstairs bedroom.  Officer Welch-Bey testified that when Ayers woke up and got out of bed, he saw his face and recognized him from the surveillance footage.  He also identified Ayers at the suppression hearing.

{¶ 9}   Officer Welch-Bey arrested Ayers, informed him of his *Miranda* rights, and placed him in a patrol car.  He told Ayers that he believed a firearm was involved, and Ayers stated that he did not own any firearms.  Officers then spoke to Warren, who provided written consent to search the home.  Upon searching the home, no firearm was recovered.  Officers then asked Ayers and Warren for keys to the Altima, but neither was able to produce keys for the vehicle.  Officer Welch-Bey had the vehicle towed to the North Olmsted Police Department to wait for a search warrant for the vehicle.  He then transported Ayers to the police department as well.  Subsequently, another officer administered a photo lineup to Hawthorne, who identified Ayers as the individual who robbed him on July 4, 2018.

{¶ 10}  The state also called North Olmsted Detective Michael Gasdick ("Detective Gasdick"), who testified that he responded to the Manor Drive address and assisted in the search of the residence.  Detective Gasdick testified that he did not recover a firearm from the residence, and the only thing of note from that search was a large amount of cash.  Officers did not count or collect the cash.  Detective Gasdick also testified that on July 9, 2018, a search warrant was obtained and

executed for the Altima, and that this search resulted in the seizure of a Nike backpack, a Star Wars wallet containing a Speedway card, and a rust-colored six-inch knife. On May 1, 2019, the court denied the motion to suppress.

{¶ 11} On May 20, 2019, the case proceeded to a jury trial. The state called Hawthorne, who testified that around 11:30 a.m. on July 4, 2018, he was standing outside of his apartment complex smoking when he was approached by a car driven by an older black man wearing black pants and a black shirt. Hawthorne testified that the vehicle stopped and he got into the back of the car because he was interested in buying a video game from the man and selling marijuana to the man. At trial, Hawthorne identified Ayers as the man who approached him on July 4, 2018.

{¶ 12} Hawthorne testified that Ayers got out of his car to check something under the hood, and then got into the front passenger seat. Hawthorne testified that Ayers pulled a gun on him, and he let Ayers take his Nike backpack. When the prosecutor showed him photos of items seized from the Altima, Hawthorne identified his backpack and wallet. Hawthorne testified that he did not remember what exactly Ayers said to him when he pulled out the gun, but he understood that he was getting robbed. Hawthorne described the gun as black and "kind of rusted." Hawthorne testified that after he gave Ayers his bag, Ayers told him to get out of the car, so he got out of the car and called the police. Ayers drove away.

{¶ 13} The state also called North Olmsted Detective William Saringer ("Detective Saringer"), who testified that he obtained a search warrant for the Altima and interviewed Ayers in connection with this case. He testified that the search of

the vehicle revealed a Star Wars wallet in the front passenger door, a knife under the driver's seat, and a Nike backpack in the vehicle's trunk. Detective Saringer described the knife as approximately six inches, with a rust-colored blade and black handle.

{¶ 14} Detective Saringer also described how he prepared the photo lineup that another officer administered to Hawthorne, and testified that Hawthorne identified Ayers as the individual who robbed him. At trial, Detective Saringer identified Ayers. He also testified that he interviewed Ayers, who told him that on July 4, 2018, he had been visiting a female friend who lived in the Jamestown Apartment complex. Detective Saringer testified that Ayers told him that he had been interested in buying marijuana and he met someone he referred to as "A." During the interview, Ayers told the detective that A. had robbed him with a gun. When Detective Saringer asked Ayers about the items recovered in the Altima, Ayers was unable to provide an explanation as to how they ended up in the vehicle. Finally, Detective Saringer testified that no firearm was found in the vehicle or otherwise recovered during the investigation of this case.

{¶ 15} At the end of Detective Saringer's testimony, the court permitted jurors to submit additional questions for him. One juror question was "is having the knife — is it in violation of his parole?" Both the prosecutor and defense counsel objected to the question, and the court sustained the objections, noting that the question assumed something not in evidence. As a result, this question was not asked to Detective Saringer.

{¶ 16} The state also called Officer Welch-Bey, who provided testimony similar to his aforementioned testimony at the suppression hearing. Officer Welch-Bey testified that he responded to a report of an armed robbery, and described Hawthorne as "shaken up" and "emotional." He also described how he spoke with the building manager of a nearby apartment building and obtained surveillance footage showing the area where the robbery was alleged to have taken place.

{¶ 17} The state played the surveillance video for the jury. The video showed a tan Nissan Altima pull into the driveway of the apartment building and park, and then a man got out of the vehicle, opened its hood, and get back into the vehicle before driving away. Officer Welch-Bey identified Ayers in the video. He also testified that when he reviewed the surveillance video, he observed that there was also an occupant in the backseat of the vehicle. Officer Welch-Bey also testified that Ayers initially denied robbing anyone, and then said that he was actually the one who had been robbed.

{¶ 18} The state called Detective Gasdick, who provided testimony similar to his aforementioned testimony at the suppression hearing. The state also called North Olmsted Police Officer Ryan Dimatteo ("Officer Dimatteo"), who testified that he administered a photo lineup to Hawthorne, who was able to positively identify Ayers as the individual who robbed him on July 4, 2018.

{¶ 19} At the close of the state's case, Ayers made a Crim.R. 29 motion for acquittal. The court denied this motion. Ayers called Warren as a witness. Warren testified that she had two children with Ayers and she previously lived in the two-

family home at 10801 Manor Avenue.  Warren testified that on July 6, 2018, police came to this address because her car, the Nissan Altima, had been used in a hit and run.  Warren explained that Ayers, along with numerous other family members, had permission to use the Altima.  Warren testified that Ayers did not have a gun in the home, and that she gave police permission to search her home.  Warren testified that on July 4, 2018, she was in the hospital having her appendix removed, and Ayers had the Altima that morning but she did not know where was going.  Ayers picked up Warren from the hospital around 5 p.m. on July 4 and they went straight home.  According to Warren, Ayers did not say anything to her about being robbed.

{¶ 20} Ayers renewed his Crim.R. 29 motion, and the court denied this motion.  On May 22, 2019, the jury returned a guilty verdict on the aggravated robbery charge, and not guilty verdicts as to the firearm specifications and the having weapons while under disability charge.

{¶ 21} On May 30, 2019, the court held a sentencing hearing.  The court heard from the prosecutor, defense counsel, a detective who spoke on behalf of Ayers and asked for a minimal prison sentence, and Ayers.  The court sentenced Ayers to four years in prison and imposed court costs.  Ayers appeals, presenting four assignments of error for our review.

**Law and Analysis**

**I.  Sufficiency and Manifest Weight of the Evidence**

{¶ 22} In his first assignment of error, Ayers argues that his conviction is against the manifest weight of the evidence.  In his second assignment of error, Ayers

argues that his conviction was not supported by sufficient evidence. In support of both assignments of error, he points to the alleged inconsistency in the jury's verdict. We will address these assignments of error together.

{¶ 23} A sufficiency challenge requires a court to determine whether the state has met its burden of production at trial and to consider not the credibility of the evidence but whether, if credible, the evidence presented would support a conviction. *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997). The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *State v. Jenks*, 61 Ohio St.3d 259, 273, 574 N.E.2d 492 (1991), citing *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).

{¶ 24} Unlike a challenge to the sufficiency of evidence, a manifest weight challenge attacks the quality of the evidence and questions whether the state met its burden of persuasion at trial. *State v. Hill*, 8th Dist. Cuyahoga No. 99819, 2014-Ohio-387, ¶ 25, citing *State v. Bowden*, 8th Dist. Cuyahoga No. 92266, 2009-Ohio-3598, ¶ 13. When reviewing a manifest weight challenge, a court reviews the entire record, weighing all evidence and reasonable inferences and considering the credibility of the witnesses, to determine whether the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed. *Thompkins* at 387.

{¶ 25} Ayers was found guilty of aggravated robbery, in violation of R.C. 2911.01(A)(1), which provides that:

> [n]o person, in attempting or committing a theft offense, as defined in section 2913.01 of the Revised Code, or in fleeing immediately after the attempt or offense, shall * * * have a deadly weapon on or about the offender's person or under the offender's control and either display the weapon, brandish it, indicate that the offender possesses it, or use it.

The indictment alleged that the deadly weapon was "to wit[, a] firearm." The entirety of Ayers's arguments for both his sufficiency and manifest weight claims rests on an alleged inconsistency in the jury verdicts. Specifically, Ayers asserts that the jury determined that no firearm was involved in the incident, as evidenced by its not guilty verdicts on the firearm specifications and the having weapons while under disability offense. Ayers further asserts that the jury essentially found that an aggravated robbery had been committed, but not with a firearm as alleged in the indictment and by the victim in his trial testimony. We disagree.

{¶ 26} As an initial matter, the alleged inconsistency has no bearing on our analysis with respect to sufficiency of the evidence. At trial, Hawthorne testified that Ayers robbed him at gunpoint, taking his backpack and wallet. This evidence would be sufficient to sustain a conviction for aggravated robbery on its own. Here, though, the victim's testimony was corroborated by video surveillance footage placing Ayers near the scene of the crime at the approximate time of the incident. It was also corroborated by the physical evidence — Hawthorne's backpack and wallet — that was recovered in the vehicle Ayers used on the day of the incident. Viewing this evidence in the light most favorable to the state, we conclude that any rational trier

of fact could have found the essential elements of aggravated robbery proven beyond a reasonable doubt. Finding sufficient evidence to support his conviction, we overrule Ayers's second assignment of error.

{¶ 27} With respect to Ayers's argument regarding the allegedly inconsistent jury verdicts, in general, consistency in a jury verdict is not necessary. *Dunn v. United States*, 284 U.S. 390, 393, 52 S.Ct. 189, 76 L.Ed. 356 (1932). Ohio courts have consistently held that the counts of an indictment are not interdependent, and an impermissible inconsistency in a verdict only arises out of inconsistent responses to the same count, not inconsistent responses to different counts. *State v. Houser*, 8th Dist. Cuyahoga No. 69639, 1996 Ohio App. LEXIS 2285, 22 (May 30, 1996), citing *State v. Brown*, 12 Ohio St.3d 147, 147, 465 N.E.2d 889 (1984). "[J]uries can reach inconsistent verdicts for any number of reasons, including mistake, compromise, or leniency," and such an inconsistency does not justify overturning a guilty verdict. *State v. Taylor*, 8th Dist. Cuyahoga No. 89629, 2008-Ohio-1626, ¶ 10, citing *United States v. Powell*, 469 U.S. 57, 68, 105 S.Ct. 471, 83 L.Ed.2d 461 (1984).

{¶ 28} Beyond this general rule, Ohio courts have specifically held that a not guilty verdict on firearm specifications is not inconsistent with a guilty verdict for aggravated robbery. *State v. Williams*, 8th Dist. Cuyahoga No. 95796, 2011-Ohio-5483, ¶ 41, citing *State v. Vaughn Hardware*, 8th Dist. Cuyahoga No. 93639, 2010-Ohio-4346, ¶ 17, citing *State v. Fair*, 8th Dist. Cuyahoga No. 89653, 2008-Ohio-

930, ¶ 24. In those cases, as in the instant case, the crime of aggravated robbery is not dependent on a firearm specification, or any other offense.

{¶ 29} In challenging the jury's verdicts, Ayers emphasizes a comment the court made at sentencing. In response to defense counsel's statement that the verdict was inconsistent, the court remarked that the jury could have concluded that the deadly weapon Ayers used was the knife recovered in the Altima and not a firearm. On appeal, Ayers characterizes the court's comments as inappropriate fact-finding. The state, in turn, argues that the jury clearly considered Hawthorne's testimony that he was robbed at gunpoint in the context of the evidence that a knife, and not a firearm, was recovered from the vehicle. Neither argument is relevant to our analysis here.

{¶ 30} "'An appellate court is not permitted to speculate about the reason for the inconsistency when it determines the validity of a verdict.'" *State v. Morris*, 8th Dist. Cuyahoga No. 94923, 2011-Ohio-824, ¶ 12, quoting *State v. Trewartha*, 165 Ohio App.3d 91, 2005-Ohio-5697, 844 N.E.2d 1218, ¶ 16 (10th Dist.), *discretionary appeal not allowed*, *State v. Trewartha*, 108 Ohio St.3d 1475, 2006-Ohio-665, 842 N.E.2d 1054. As discussed above, because the aggravated robbery is a separate offense and not dependent on the firearm specifications or the having weapons under disability count, consistency is not required. This is true "irrespective of [the conviction's] rational incompatibility with the acquittal." *Morris* at *id.*, citing *State v. Woodson*, 24 Ohio App.3d 143, 493 N.E.2d 1018 (10th Dist.1985), and *State v.*

*Adams*, 53 Ohio St.2d 223, 228, 374 N.E.2d 137 (1978).  Therefore, speculation as to the jury's rational, if any, is outside the scope of our review.

{¶ 31}  Further, the jury can believe all, part, or none of the testimony of each witness who appears at trial.  *State v. Mackey*, 8th Dist. Cuyahoga No. 75300, 1999 Ohio App. LEXIS 5902, 22 (Dec. 9, 1999), citing *State v. Nichols*, 85 Ohio App.3d 65, 76, 619 N.E.2d 80 (4th Dist.1983).  Ayers argues that based on the verdicts, the jury ultimately concluded that Hawthorne's testimony lacked credibility.  We disagree.

{¶ 32} As discussed above, the jury could have found Ayers guilty based solely on Hawthorne's testimony.  In addition, the main way in which Hawthorne lacked credibility, according to Ayers, is based on his initial reluctance to tell the police that he was selling marijuana to Ayers.  We do not find this reluctance so significant as to undermine Hawthorne's credibility.  First, there are numerous reasons that an individual would be reluctant to admit criminal behavior to a law enforcement officer.  Second, although the initial reason for the encounter is helpful in establishing the context in which the aggravated robbery occurred, the reason that Hawthorne got into the car with Ayers does not address any of the elements of the crime of aggravated robbery.  Finally, although Hawthorne was not immediately forthcoming regarding the nature of his initial interaction with Ayers, he admitted this to police upon further questioning.  The majority of Hawthorne's account of the events was not changed by his initial omission.  This is not the exceptional case in which the jury lost its way and created a manifest miscarriage of justice.  Ayers's

conviction for aggravated robbery was not against the manifest weight of the evidence. Therefore, his first assignment of error is overruled.

## II. Juror Misconduct

{¶ 33} In his third assignment of error, Ayers argues that he was denied his right to a fair and impartial trial because of a question submitted to the court by a juror during the trial. According to Ayers, the unasked juror question shows that the jury was impartial, in violation of his constitutional rights. Ayers argues that the court should have conducted an inquiry to determine how exactly the juror acquired information about Ayers's parole status, how that information impacted the juror's thinking, and whether the information had been communicated to the other jurors.

{¶ 34} At trial, the prosecutor and defense counsel both objected to the question about parole. The court sustained both objections and declined to ask the question to the witness. At no point during trial did Ayers request that the court either replace the juror or conduct an inquiry of the juror. Further, "there is no per se rule requiring an inquiry in every instance of alleged [juror] misconduct." *State v. Sanders*, 92 Ohio St.3d 245, 253, 2001-Ohio-189, 750 N.E.2d 90, quoting *United States v. Hernandez*, 921 F.2d 1569, 1577 (11th Cir.1991). Where the defense did not request a remedy at trial and expressed no dissatisfaction with the trial court's handling of alleged juror misconduct, we review for plain error. *State v. McKnight*, 107 Ohio St.3d 101, 2005-Ohio-6046, 837 N.E.2d 315, ¶ 185.

{¶ 35} Pursuant to Crim.R. 52(B), notice of plain error is to be taken with the utmost caution, under exceptional circumstances and only to prevent a manifest

miscarriage of justice. *State v. Long*, 53 Ohio St.2d 91, 91, 372 N.E.2d 804 (1978). Generally, a court will not reverse a judgment based upon juror misconduct unless the complaining party shows they were prejudiced by the misconduct. *State v. Mack*, 8th Dist. Cuyahoga No. 93091, 2010-Ohio-1420, ¶ 16, citing *State v. Keith*, 79 Ohio St.3d 514, 526, 684 N.E.2d 47 (1997).

{¶ 36} Ayers argues that the prejudicial nature of the information about his parole status cannot be disputed. Specifically, Ayers asserts that the jurors could have determined that he must have done something wrong in this case because he had committed a crime in the past. We disagree. Ayers supports his argument by asserting that the juror who asked the question uncovered extraneous information about him and was therefore improperly influenced by something not in evidence. It is perhaps theoretically possible that the juror did inappropriate outside research before formulating their question. It appears more likely, though, that the juror made an inference as to Ayers's parole status based on the fact that he was on trial for having weapons while under disability. At the outset of trial, the jury was informed of the elements of the charges Ayers faced. One of the elements of having weapons while under disability as charged in this case is that the defendant is under indictment for or has been convicted of a felony drug offense. Although the parties agree that Ayers's parole status was not in evidence, we find no plain error in the court's decision not to conduct an inquiry here. Therefore, Ayers's third assignment of error is overruled.

## III. Motion to Suppress

{¶ 37} In his fourth assignment of error, Ayers argues that the trial court erred in determining that he did not have standing to contest the seizure of the Altima. In support of his argument challenging the denial of a pretrial motion to suppress, Ayers points to testimony from trial that he had permission to use the vehicle.

{¶ 38} The Fourth Amendment to the United States Constitution protects the people's right to privacy in their person, places, and things against government intrusion in the form of unreasonable searches and seizures. One is afforded this protection "only to the extent that they have a reasonable expectation of privacy in the property at issue." *State v. Polk*, 150 Ohio St.3d 29, 2017-Ohio-2735, 78 N.E.3d 834, ¶ 27, citing *Athens v. Wolf*, 38 Ohio St.2d 237, 240, 313 N.E.2d 405 (1974). Because Fourth Amendment rights are personal and cannot be asserted vicariously, a defendant bears the burden of proving that the seizure was illegal and that they had a legitimate expectation of privacy in the property. *State v. Lumbus*, 2016-Ohio-380, 59 N.E.3d 580, ¶ 72 (8th Dist.), citing *Rakas v. Illinois*, 439 U.S. 128, 133-134, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978), and *State v. Dennis*, 79 Ohio St.3d 421, 426, 683 N.E.2d 1096 (1997).

{¶ 39} Ayers argues that the testimony at the suppression hearing was sufficient to establish that he had a reasonable expectation of privacy in the Altima. The specific testimony he points to from the suppression hearing is Officer Welch-Bey's testimony that, upon being told that the Altima was involved in an accident on

July 4, and was driven by a young male, Warren's father said that Ayers must have been driving the vehicle. This is testimony that Ayers had been driving the vehicle, not that he owned the vehicle or even that he had been driving the vehicle with permission. Further, this statement was not made by the owner of the vehicle; the vehicle's owner did not testify at the suppression hearing or at trial, and there is nothing in the record indicating that anyone involved in this case ever communicated with the owner. Further, when officers asked for keys to the Altima, no one in the home, including Ayers, was able to produce the keys. Considering the evidence presented at the suppression hearing, we conclude that the trial court properly denied the motion to suppress. Ayers's fourth assignment of error is overruled.

{¶ 40} Judgment affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
RAYMOND C. HEADEN, JUDGE

MARY J. BOYLE, P.J., and
FRANK D. CELEBREZZE, JR., J., CONCUR